# IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MARYLAND
## SOUTHERN DIVISION

STEVEN POLING                                    :

      Plaintiff                               :

                               : CASE No. RWT-12cv454
v.

GARY D. MAYNARD, et al                    :

      Defendants                            :

## DEFENDANT WEXFORD HEALTH SOURCES, INC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO COUNT I

Dated: June 5, 2015

Respectfully Submitted,

**MEYERS, RODBELL & ROSENBAUM, P.A.**

By: _____
Joseph B. Chazen
Federal Bar No. 03154
jchazen@mrrlaw.net

By: _____
Gina M. Smith
Federal Bar No. 03724
gsmith@mrrlaw.net

{107822.DOCX}

# TABLE OF CONTENTS

I.  INTRODUCTION.................. .................................................................... 1

II.  STATEMENT OF UNDISPUTED MATERIAL FACTS ........................... 3

    A. Scope of Wexford's Contractual Services Between January 2009 and the Date of Plaintiff's Diagnosis of the meningioma......................... 3

    B. The Utilization Review Process in the DPSCS System .................. 4

    C. Wexford's Utilization Review Decisions between January 1, 2011 and February 27, 2012 the Date of Plaintiff's Diagnosis ...................... 7

        1. April 2011 Requests for Specialty Services and Utilization Review Decisions ............................................... 7

        2. July 2011 Requests for Specialty Services and Utilization Review Decisions ............................................................. 9

        3. August 2011 Requests for Specialty Services and Utilization Review Decisions ....................................... 11

        4. November 2011 Requests for Specialty Services and Utilization Review Decisions ....................................... 12

        5. December 2011 Requests for Specialty Services and Utilization Review Decisions ....................................... 13

        6. January 2012 Requests for Specialty Services and Utilization Review Decisions...................................... 16

        7. February 2012 Requests for Specialty Services and Utilization Review Decisions...................................... 17

III.  STANDARD OF REVIEW .............................................................. 19

IV.  ARGUMENT .................................................................................. 20

    A. Plaintiff's Federal Constitutional Claims ...................................... 19

        1. Wexford is not a Person for Purposes of 42 U.S.C. § 1983 ...........24

        2. Plaintiff Cannot Establish the Existence of a Policy, Custom or Practice of Wexford that Violated Plaintiff's Constitutional Rights..... 25

i

        a.  Wexford's UM Policy was Neither Unconstitutional Nor the Direct Cause of Plaintiff's Alleged Deprivation of Care. .................. 28

        b.  Plaintiff has no Viable Failure to Train Claim against Wexford..... 36

  B. Wexford's Utilization Review Decisions were not Deliberately Indifferent and a Medical Malpractice Claim Does Not Give Rise to a Violation of Plaintiff's Constitutional Rights.................................................... 39

  C. Plaintiff is Not Entitled to Punitive Damages ................................. 43

  D. Plaintiff Cannot Prevail On His Claim For Declaratory Relief........... 44

  E. Plaintiff Is Not Entitled To Injunctive Relief ................................. 44

V.     CONCLUSION ................................................................. 46

# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND SOUTHERN DIVISION

STEVEN POLING                               :

    Plaintiff                              :

v.                                          : CASE No. RWT-12cv454

GARY D. MAYNARD, et al                      :

    Defendants                             :

## MEMORANDUM OF LAW

Defendant Wexford Health Sources, Inc. ("Wexford"), by its undersigned counsel, Joseph B. Chazen, Gina M. Smith and Meyers, Rodbell & Rosenbaum, P.A., hereby submits the following Memorandum of Law in support of its Motion for Partial Summary Judgment as to Count I.

## I.  INTRODUCTION

On February 14, 2012, Plaintiff Steven Poling, *pro se*, an inmate at Maryland Correctional Institute Hagerstown ("MCIH") in Hagerstown, Maryland, initiated this action claiming a violation of Plaintiff's constitutional rights under 42 U.S.C. § 1983 based on deliberate indifference of his medical needs. ECF No. 1. Subsequently, counsel was appointed on Plaintiff's behalf and on December 18, 2012, an Amended Complaint was filed adding new defendants, additional factual allegations, restating Plaintiff's claim for violation of his constitutional rights (Count I) and adding a new claim for medical negligence under state law. (Count II). ECF. No.11 and ECF No. 30.

Plaintiff's claims concern the alleged failure to timely diagnose and treat a

foramen meningioma[1]. ECF No. 30 at ¶39. Specifically, Plaintiff alleges that between April 2011 and February 27, 2012, the date of his ultimate diagnosis of the meningioma, that he was denied competent and complete clinical evaluations by his on-site providers and denied off-site specialty care, such as referrals to consult physicians and referrals for imaging studies. Id. at ¶¶ 1, 12, 40. Plaintiff contends that if he was provided this appropriate care he would have been timely diagnosed and afforded proper treatment for his condition. Id. at ¶¶ 1-63.

With regard to Count I, Plaintiff alleges deliberate indifference to his medical needs for deprivations under the Fifth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution for: the denial of access to adequate and competent medical treatment, care and facilities; the failure and refusal to carry out and/or complete treatment plans and orders recommended by physicians and other health care providers; and the failure or refusal to deliver prescribed medications. Id. at ¶¶ 1, 15-57.

In addition to claiming that the employees of Defendants knowingly, deliberately and intentionally, disregarded the health and well-being of Plaintiff, Plaintiff also alleges that policies and practices of Defendants, "particularly the policy and practice of reducing inmate offsite health care costs" rise to the level of "shock[ing] the conscience of civilized persons and [are] intolerable. Id. at ¶ 1.

As to Wexford, Plaintiff alleges it provided utilization management services requiring it to review and approve all requests for onsite and off-site medical evaluations, consultations and treatment. Plaintiff further alleges that Wexford provided health care services to Plaintiff through its agents Defendants Vonnie Marshik, M.D., Ben

---

[1] Foramen meningioma is a tumor of the foramen magnum (the large opening in the base of the skull). See http://www.researchgate.net/publication/8061601_Foramen_magnum_meningiomas_concepts_classifications_and_nuances

Oteyza, M.D., Noor Siddiqui, M.D., Colin Ottey, M.D. and Emily Staub, P.A.[2] Id. at ¶ 9.

Regarding policy, practice and customs allegedly attributed to Wexford resulting in the deprivation of Plaintiff's constitutional rights, Plaintiff contends that:

- Defendant Wexford knowing of the medical needs of Plaintiff, and with deliberate indifference to the inadequacies and deficiencies in the medical facilities, staffing and procedures at MCI-H, have failed and neglected to establish and implement policies, practices and procedures designed to assure that Plaintiff receive medical treatment and care at the standards therefor in the State of Maryland as a whole, or have adopted policies, practices and procedures which Defendant knew, or reasonably should have known, would be ineffective in delivering medical treatment and care at such standards, thereby endangering the Plaintiffs health and well-being in violation of rights secured to Plaintiff by the Fifth, Eighth, Ninth and Fourteenth Amendments to the Unites States Constitution;
- Wexford was responsible for an official policy or custom under which a subordinate acted in denying needed medical care to the Plaintiff;
- Wexford had knowledge its subordinates were involved in conduct posing a pervasive and unreasonable risk of constitutional injury;
- Wexford through its subordinates showed an inadequate response that amounted to deliberate indifference or tacit authorization to deny Plaintiff needed medical evaluations, care and treatment causing Plaintiff to endure for over two years the devastating effects of a brain tumor; and
- Wexford had a duty to train their employees and agents to assure the delivery of medical care to Plaintiff which is consistent with the standards of medical care in the State of Maryland as a whole.

Id. at ¶¶ 51-52.

As to Count I, Plaintiff seeks compensatory damages, punitive damages, injunctive and declaratory relief. See ECF No. 30 at pp 20-21.

## II.   STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.   Scope of Wexford's Contractual Services Between January 2009 and the Date of Plaintiff's Diagnosis of the Meningioma

During the period of July 1, 2005 through June 30, 2012, Wexford was solely contracted with Maryland's Department of Public Safety and Correctional Services ("DPSCS") to provide utilization review services for inmates in the system.  See

---

[2] P.A. Staub was dismissed from this action on September 24, 2014. ECF No. 91.

3

Wexford's Answers to Interrogatories at p. 3 attached hereto as Exhibit 1. Throughout the relevant timeframe, the scope of Wexford's utilization review services provided to inmates in the DPSCS system included reviewing requests received from correctional site medical providers for non-emergent specialty care for certain diagnostic testing, referrals to specialists and other offsite specialty care for approval, deferral, denial or other recommendation. Id.

Accordingly, at all times relevant to the Plaintiff's Complaint, Wexford did not provide primary health care to inmates in the DPSCS and thus did not employ the on-site primary health care providers delivering health care to Plaintiff including, but not limited to, Vonnie Marshik, M.D., Ben Oteyza, M.D., Noor Siddiqui, M.D., Emily Staub, P.A. and Colin Ottey, M.D., who were named as Defendants in this lawsuit. Id. Rather, primary medical care to the inmates in the DPSCS system before July 1, 2012 was provided by Co-Defendant Corizon. Id. at p. 16. Prior to July 1, 2012, neither Wexford nor its employees, agents or servants had any direct contact with Plaintiff. Id. at p. 4.

On July 1, 2012, Wexford become the primary medical contractor for inmates in the DPSCS system. Id. Wexford also continues to provide utilization review services. Id.

## B. The Utilization Review Process in the DPSCS System

The on-site primary medical providers delivering medical care in the DPSCS system would present requests for elective, out-patient specialty care including, but not limited to, certain diagnostic testing, physical therapy, evaluation by specialty physicians and elective surgical care, to Wexford for utilization review. Id. at p. 10-12. Patients for whom utilization reviews were sought would be placed on a list which was circulated to

participants in the utilization review process. Id. At a designated date and time for each correctional facility, on-site medical providers who were tasked with presenting cases for utilization review would participate in a conference call with a Wexford utilization review physician and utilization review nurse. Id. Written requests for consultations and/or for diagnostic testing generated by the primary medical provider were not always circulated in advance of that call to Wexford. Id. Additionally, patients could be added to the list at the time of the call to expedite approval for care. Id.

During that utilization review conference call, the primary medical provider would identify the specialty care sought and provide information that he or she deemed pertinent regarding the patient in support of that request. Id. This process is referred to as "collegial review". Id. Following presentation, a decision was rendered which typically fell into three categories (1) approval of the care; (2) proposal of alternative treatment; (3) a deferral of disposition on the basis that further clinical information was necessary to make a determination. Id. A summary of the presented requests and utilization management decision was created and contemporaneously documented at the time of the collegial review by Wexford's utilization review nurses in Wexford's record keeping system referred to as "Wexcare". Id. at p. 11 and see Deposition Transcript of Robert Smith, M.D. attached hereto as Exhibit 2 at pp. 38:2-10; 77:18-22; 93:14-22; 94:1.

If the specialty care requested was not approved an appeal process existed to reverse the utilization review decision. See Exhibit 1 at p. 11; see Exhibit 2 at pp. 85-90. That process is set forth in Wexford's Maryland DPSCS Utilization Management Policies and Procedures ("Wexford's UM Policy"). See Wexford UM Policy attached

hereto as Exhibit 3 at p. WEXMSJ000020. The process was also adopted and restated, in part, by the DPSCS Office of Clinical Services/Inmate Health Services Medical Evaluations Manual, Chapter 5 Consultations ("DPSCS Consult Policy"). See DPSCS Consult Policy attached hereto as Exhibit 4.

The process provided that the Site Medical Director could appeal the decision to the utilization management physician who made the initial utilization review decision. See Exhibit 1 at pp. 11-12 and Exhibit 3 at p. WEXMSJ0000020. If the decision was not reversed, but affirmed, a second appeal could be secured with another physician reviewer other than the original utilization management physician. See Exhibit 3 at p. WEXMSJ0000020. If reversal was not secured at the second appeal level, a final appeal could be made with the DPSCS State Medical Director who was the final decision maker. Id.

Following an initial utilization review decision, in the event of a change in the patient's clinical condition related to the original request for specialty care and\or continuing complaints from the patient, cases could be re-presented for utilization review at any time or as often as deemed appropriate by the primary medical provider. See Exhibit 1 at p. 12.

Acute medical care, including emergency evaluations in a hospital setting, did not require prospective utilization review for pre-authorization of the care. Id. Rather, the patient could be sent out immediately and utilization reviews of this care were only performed retrospectively. Id.

During the relevant timeframe, the primary medical provider, Defendant Corizon, was responsible for orienting its medical staff and locum tenens staff to the UM Policy

and the DPSCS Consultation Policy. See Deposition Transcript of Corizon Corporate Designee John Rainey attached hereto as Exhibit 5 at pp. 18:6-22; 25:14-25; 26:1-24; 27:3-14; 66:8-25; 67:1-22.

### C. Wexford Utilization Review Decisions between January 1, 2011 and February 27, 2012, the Date of Plaintiffs Diagnosis

1. **April 2011 Requests for Specialty Services and Utilization Review Decisions**

There is a written consult request in Plaintiff's medical chart dated April 25, 2011 authored by Co-Defendant Dr. Oteyza that identifies the specialty service requested as "orthopedics" and the procedure or test requested as "exam, evaluate and possible biopsy of neck mass". See relevant DPSCS medical records of Plaintiff attached hereto as Exhibit 6 at p WEXMSJ000003-4. This April 25th consult reflects that

> "[Plaintiff] was in a fight 3 years ago and was kicked in the neck. Since with pains..."

Id. at p. WEXMSJ000003.

The consult request also identifies a neck lump described as oval, non-tender and movable. Id.

Subsequently, on or about April 28, 2011, a request for utilization review authorization was presented to Wexford utilization review physician Robert Smith, M.D. ("Dr. Smith"). See relevant Wexcare Utilization Notes attached hereto as Exhibit 7 at p. WEXMSJ000001. Dr. Smith is not a named defendant in this suit. See ECF No. 30.

The collegial review discussion, summarized contemporaneously by the Wexford utilization management staff and recorded in Wexford's records, reflects that the request was for an orthopedic evaluation. See Exhibit 7 at p. WEXMSJ000001. Furthermore, it is documented in Wexford's utilization review records that the inmate

had an injury three years ago and was complaining of neck pain, but no weakness. Id. Additionally, it is recorded that x-ray films were negative. Id.

Dr. Smith's utilization review decision was to deny the orthopedic request and to recommend conservative treatment as an alternative plan. Id. and see Exhibit 2 at pp. 96:4-22; 97:1-17.

It is undisputed that this utilization review decision was not appealed by Corizon. See Corizon's Answers to Wexford's Interrogatory attached hereto as Exhibit 8 at p. WEXMSJ000003. It is also undisputed that pursuant to the DPSCS Consult Policy and Wexford's UM Policy that Corizon had the right to appeal Dr. Smith's decision for conservative care to seek to and secure the specialty care requested if medical providers disagreed with Dr. Smith's disposition of the request. See Exhibits 1, 3, and 4. Furthermore, exhaustion of all appeal remedies included: at the first level, reconsideration of this decision by Dr. Smith; at the second level, reconsideration by a Corporate utilization review physician other than the originating reviewer; and at the third level, reconsideration by the DPSCS State Medical Director. See Exhibit 3 at p. WEXMSJ0000020.

There is no indication in Wexford's Wexcare utilization review records that Plaintiff's neck lump, including a biopsy of the lump, was discussed during the collegial review discussion or that investigation of the lump was the specific reason for the specialty care being pursued. See Exhibit 7 at p. WEXMSJ000001. Dr. Smith has testified that the issue of a neck mass was not presented to him as part of the collegial review. See Exhibit 2 at pp. 97:4-22; 98-99; 100:1-5.

To the extent there is a dispute of fact as to whether the neck lump was or was

not presented to Dr. Smith as a clinical finding necessitating biopsy, it is undisputed that: (a) no other on-site medical provider at MCIH ever observed a neck lump when examining Plaintiff; (b) in the months leading up to his diagnosis Plaintiff was seen and evaluated by a physiatrist at Bon Secours Hospital, emergency room physicians at Meritus Medical Center and Bon Secours Hospital and a neurologist at Bon Secours Hospital and no one identified a movable neck lump; (c) Plaintiff's treating neurosurgeon at University of Maryland Medical System who removed Plaintiff's brain tumor never identified the presence of a movable neck lump or neck mass; and (d) even if a neck lump or mass existed in April 2011, according to Plaintiff's own experts, in retrospect, such a finding was entirely unrelated to Plaintiff's brain tumor. See Exhibit 2 at pp. 97-100; 106:7-15; 107:7-12; and 153:8-10; Exhibit 6 at WEXMSJ00001-47; Deposition transcript of treating neurosurgeon Hazem Ahmed, M.D. attached hereto as Exhibit 9 at pp. 61-63; Deposition transcript of Paul Genecin, M.D. Volume II, attached hereto as Exhibit 10 at pp. 162:19-22,163:1-2; Deposition transcript of Robert Greifinger, M.D. attached hereto as Exhibit 11 at pp. 108:14-22; 109:1-6.

2.   **July 2011 Requests for Specialty Services and Utilization Review Decisions**

There is a written consult request in Plaintiff's medical chart dated July 25, 2011, authored by Co-Defendant Dr. Oteyza which identifies the specialty service requested as "orthopedics" and the procedure or test requested as "MRI, c-spines vs. consult with orthopedics". See Exhibit 6 at WEXMSJ000009-10. That written consult documents Plaintiff's complaints of neck pain with radiation down the left arm. Id. This consult request further provides that Plaintiff:

"had several x-rays of the spines in 2009 and 2010 with no significant findings to

explain complaints. This inmate likes to build body muscle and has good physique. On exam there was good movement of the neck, which he contributes to heavy use of Ibuprofen 1200 mg (sic) the morning (sic) visit. "

Id.

It is undisputed that the on-site primary medical providers were responsible for initiating a request for utilization authorization. See Exhibit 1 at p. 11; Exhibit 2 at pp. 62-63; and Exhibit 5 at p. 69:14-20. Based on the factual record as developed after exhaustive discovery, there is no evidence that the July 25, 2011 consult request was sent to Wexford for initiation of a the utilization review process. See Exhibit 1 at pp. 13-14; Exhibit 2 at p. 102:3-5; Exhibit 10 at pp. 164:4-22; 165:1-3; Deposition transcript of Frank Ryan, M.D. attached hereto as Exhibit 12 at pp. 81:14-22; 82:1-8. Deposition transcript of Mark Buchanan, M.D., attached hereto as Exhibit 13 at pp. 58:5-25; 59:1-6; Deposition transcript of Nathaniel Evans, M.D., attached hereto Exhibit 14 at pp. 101:22-25; 102:1-3; Deposition transcript of Peter Crum, M.D. attached hereto as Exhibit 15 at pp. 85:18-22; 86:1-2. Nor is there any evidence from the factual record as developed that a collegial review discussion on the July 25th request was ever held or that a utilization review decision was ever rendered by Wexford. Id.

Assuming *arguendo* that the July 25, 2011 consult was presented for a utilization management decision, based on the factual record in this case, it is undisputed that no appeal record exists for this July 25, 2011 consult request. Id and see Exhibit 8 at p. WEXMSJ000003. It is undisputed that pursuant to the DPSCS Consult Policy and Wexford's UM Policy that if a utilization decision had been issued that Corizon had the right to appeal any such decision. See Exhibits 1, 3 and 4.

Furthermore, exhaustion of all appeal remedies included: at the first level,

reconsideration of this decision by Dr. Smith; at the second level reconsideration by a

Corporate utilization review physician other than the originating reviewer; and at the

third level, reconsideration by the DPSCS State Medical Director.  See Exhibit 3 at p.

WEXMSJ0000020.  No such appeals were ever taken.

3.    **August 2011 Requests for Specialty Services and Utilization  Review Decisions**

There is a written consult request in Plaintiff's medical chart dated August 22,

2011 which was authored by former Co-Defendant Emily Staub, P.A.  See Exhibit 6 at

pp. WEXMSJ000014-15.  The August 22nd consult request identifies the specialty

service requested as "neurology" and the procedure/test requested as an exam. Id.  At

that time, the findings recorded on the written consult request included:

> [full range of motion] of the cervical spine with noted tenderness, no spasm;
> upper [extremity] muscle strength 4/5 on the left and 5/5 on the right, no muscle
> atrophy noted; unable to fan 3rd, 4th 5th fingers in the left hand; sensation is
> decreased on the left when compared to the right, reflexes normal"

Id.

Subsequently, on or about August 24, 2011, a request for utilization review

authorization was presented to Wexford utilization review physician, Dr. Smith. Exhibit 7

at p. WEXMSJ000002 Plaintiff's medical chart reflects and the testimony of P.A. Staub

confirms that this August 24th consult was discussed with Dr. Smith whose utilization

review decision was to refer Plaintiff to physical therapy as an alternative treatment plan

instead of to neurology.  Id. and see Deposition transcript of Emily Staub Miller, P.A.

attached hereto as Exhibit 16 at pp. 56-61. Wexford's utilization records reflect that a

collegial review took place between P.A. Staub and Dr. Smith on this date due to the

Plaintiff's complaint of left sided neck pain with radiculopathy and that the request was

for physical therapy which was approved. See Exhibit 7 at p. WEXMSJ000002.

Following this collegial review on August 25, 2011, the chart reflects that a new consult request was written for physical therapy specialty services including evaluation and treatment by P.A. Staub. See Exhibit 6 at p. WEXMSJ000017; and Exhibit 16 at pp. 59-61.

It is undisputed that this utilization review decision was not appealed by Corizon. See Exhibit 8 at pp. WEXMSJ000002-3. It is undisputed that pursuant to DPSCS Consult Policy and Wexford's UM Policy, that Corizon had the right to appeal the alternative treatment plan (physical therapy versus neurology evaluation) which was approved by Dr. Smith to reverse that decision if the on-site medical providers disagreed with Dr. Smith's disposition of the request. See Exhibit 1, 3 and 4. Furthermore, exhaustion of all appeal remedies included: at the first level, reconsideration of this decision by Dr. Smith; at the second level reconsideration by a Corporate utilization review physician other than the originating reviewer; and at the third level, reconsideration by the DPSCS State Medical Director. See Exhibit 3 at p. WEXMSJ000020. No such appeals were taken.

### 4. November 2011 Requests for Specialty Services and Utilization Review Decisions

There is a written consult request in Plaintiff's medical chart dated November 1, 2011 which was authored by former Co-Defendant Emily Staub, P.A. See Exhibit 6 at pp. WEXMSJ000020-21. The November 1st consult request identifies the specialty service requested as "physiatry" and the procedure/test requested as an evaluation. Id.

On or about November 2, 2011, a request for utilization review authorization for this physiatry exam was presented to Wexford utilization review physician Dr. Smith.

See Exhibit 7 at p. WEXMSJ000003. The summary of the collegial review

presentation, captured contemporaneously by the Wexford's utilization management

staff, reflects that the request for physiatry evaluation was approved. Id.

### 5. December 2011 Requests for Specialty Services and Utilization Review Decisions

On December 5, 2011, Plaintiff was seen by physiatrist, Cornell Shelton, M.D. at

Bon Secours Hospital. See Exhibit 6 at pp. WEXMSJ000024-25. At that time, Plaintiff's

exam revealed cervical range of motion with full flexion[3] and full extension[4], right sided

rotation was 80 % and left sided rotation was 100 %. Id. at p. WEXMSJ000025. Deep

tendon reflexes[5] were +2 at the biceps, triceps, bracheoradialis[6] bilaterally and equal.

Id. Muscle strength was 5/5 throughout except for extrinsic hand muscles[7], but it was

felt by Dr. Shelton that "the patient was not putting full resistance". Id. Spurling[8], Adson[9]

and Hoffman[10] signs were negative. Id. No tenderness to palpation in the cervical

---

[3] Flexion refers to a movement allowed by certain joints that decreases the angle between two adjoining bones. See http://medical-dictionary.thefreedictionary.com/flexion

[4] Extension refers to a "straightening" movement allowed by certain joints that increases the angle between two adjoining bones. See http://medical-dictionary.thefreedictionary.com/extension

[5] Deep tendon reflexes or DTRs are involuntary contractions of skeletal muscle which can be increased in upper motor neuron lesions, and absent/greatly reduced in any type of lower motor neuron lesion, peripheral sensory neuropathy and the elderly; accuracy can be effected by isometric contraction (hand-clenching) at time of test. See http://medical- dictionary.thefreedictionary.com/deep+tendon+reflexes

[6] Bracheoradialis is a muscle whose action flexes the forearm. See http://medical-dictionary.thefreedictionary.com/brachioradialis

[7] Extrinsic hand muscles refers to those that are located on the dorsal aspect of the forearm (extensors) and those located on the palmar aspect of the forearm, the flexors. See http://classes.kumc. edu/ sah/ resources/handkines/muscles/extrinsics.htm

[8] Spurling test indicates pressure on a nerve root which can be correlated by dermatomal distribution of pain. A reporting of pain into the upper extremity toward the same side that the head is laterally flexed is a positive sign. See http://www.kawarthatherapeutic.com/orthopedic-tests.html

[9] Adson Test is used to determine the state of the subclavian artery, which may be compressed by an extra cervical rib or by tightened scalenus anticus or scalenus medius muscles, on its way to the upper extremity. See http://www.kawarthatherapeutic.com/orthopedic-tests.html

[10] Hoffman sign refers to the flexion of the terminal phalanx of the thumb and second and third phalanges of one or more of the fingers when the volar surface of the terminal phalanx of the fingers is flicked. See http://www.medilexicon.com/medicaldictionary.php?t=81942

segments on supine[11] position were identified, but tenderness of the left C3-4 facet was recorded. Id. No myofascial tenderness[12] on palpation in the supine position was noted. Id. No muscle tightness or trigger points[13] were appreciated. Id. No muscle atrophy[14] was appreciated. Id. Babinski[15] was noted as down going and no clonus in the upper or lower extremity were observed. Id. Dr. Shelton's assessment\diagnosis was cervical radiculitis[16] and paresthesia[17]. Id.

Dr. Shelton recommended Plaintiff be placed on Baclofen[18] and Neurontin[19] and that Plaintiff be provided physical therapy with cervical traction, manual therapy, TENS[20], etc. Id. Dr. Shelton further recommended that Plaintiff's providers consider a cervical epidural if there was no improvement with conservative treatment and "if all are

---

[11] Supine refers to a position: lying with the face upward, or on the dorsal surface of a body part. See http://medical-dictionary.thefreedictionary.com/supine
[12] Myofascial tenderness refers to tenderness in a muscle and its sheath of connective tissue, or fascia. See http://medical-dictionary.thefreedictionary.com/myofascial
[13] Trigger point refers to a localized usually tender or painful area of the body and especially of a muscle that when stimulated gives rise to pain elsewhere in the body. See http://www.merriam-webster.com/dictionary/trigger%20point
[14] Muscle atrophy refers to the loss of muscle bulk, secondary to imposed inactivity, neurological dysfunction, reduced vascular perfusion, fibrosis or specific disease. See http://medical-dictionary.thefreedictionary.com/muscle+atrophy
[15] Babinski is a reflex movement which is normal in infancy but indicates damage to the central nervous system (as in the pyramidal tracts) when occurring later in life. See http://www.merriam-webster.com/medical/babinski%20reflex
[16] Cervical radiculitis is a condition that involves the irritation or impingement of one or more cervical spinal nerves, the nerve roots that branch off the spinal cord in the neck area. Radicular refers to radiating symptoms. See http://www.laserspineinstitute.com/back_problems/ spondylosis/radiculopathy/understanding_cervical_radiculitis/
[17] Paresthesia an altered sensation reported by the patient in an area where the sensory nerve has been afflicted by a disease or an injury. The patient may report burning, prickling, formication, or other sensations. See
[18] Baclofen is a muscle relaxer and an antispastic agent. Baclofen is used to treat muscle spasm, pain, and stiffness from a variety of conditions. See http://www.drugs.com/baclofen.html
[19] Neurontin is an anti-epileptic medication, also called an anticonvulsant. It affects chemicals and nerves in the body that are involved in the cause of seizures and some types of pain. See http://www.drugs.com/neurontin.html
[20] TENS is the abbreviation for transcutaneous electrical nerve stimulation, a technique used to control chronic pain. Electrodes placed over the painful area deliver a mild electrical impulse to nearby nerve pathways, thereby easing pain. See http://medical-dictionary.thefreedictionary.com/TENS

not helpful including cervical epidural[21], consider cervical MRI". Id. It was further recommended that Plaintiff return for follow-up in 6-8 weeks. Id.

Subsequently, on December 7, 2011, Plaintiff's medical chart reflects that two separate written consult requests for specialty care were authored by P.A. Staub. See Exhibit 6 at pp. WEXMSJ000027-30. The first written consult request sought an MRI of the C-Spine from radiology services. Id. at pp. WEXMSJ000027-28. The second written consult sought epidural injections. Id. at pp. WEXMSJ000029-30.

On or about December 14, 2011, Plaintiff's case was presented to Dr. Smith for collegial discussion and for a utilization review decision authorizing the specialty care. See Exhibit 7 at p. WEXMSJ000004. Plaintiff's medical chart reflects that the utilization review decision rendered at that time was to first provide Plaintiff with physical therapy with traction consistent with Dr. Shelton's recommendation and to defer P.A. Staub's other request. See Exhibit 6 at p. WEXMSJ000032; Exhibit 16 at pp. 90-91. Wexford's utilization records reflect that the requested specialty care was for physical therapy with traction as recommended by the physiatrist which was approved. See Exhibit 7 at p. WEXMSJ000004.

It is undisputed that the utilization review decision solely approving physical therapy with traction was not appealed by Corizon. See Exhibit 8 at pp. WEXMSJ00002-3. It is undisputed that pursuant to the DPSCS Consult Policy and Wexford's UM Policy, that Corizon had the right to appeal the decision to defer the MRI of the C-Spine and\or the cervical epidural and to first allow for treatment with physical

---

[21] Cervical epidural is an injection into the epidural space of the cervical spine. See http://medical-dictionary.thefreedictionary.com/epidural

therapy and traction[22] to reverse the decision if medical providers disagreed with Dr.

Smith's disposition of the request. <u>See</u> Exhibits 1, 3, and 4.

Furthermore, exhaustion of all appeal remedies included: at the first level,

reconsideration of this decision by Dr. Smith; at the second level reconsideration by a

Corporate utilization review physician other than the originating reviewer; and at the

third level, reconsideration by the DPSCS State Medical Director. <u>See</u> Exhibit 3 at p.

WEXMSJ000020. No such appeals were taken.

### 6. January 2012 Requests for Specialty Services and Utilization Review Decisions

In January 2012, no requests for prospective utilization reviews were

submitted to Wexford. <u>See</u> Exhibit 7 at p. WEXMSJ000006.

However, on or about January 15, 2012, Wexford completed a retrospective

review of specialty care provided to Plaintiff after his on-site providers had Plaintiff

transferred to Meritus Medical Center's ("MMC") Emergency Department to rule out an

acute process related to Plaintiff's complaints of abdominal pain. <u>Id</u>. On presentation at

MMC, Plaintiff complained of constipation, left sided abdominal pain, abdominal left skin

tingling beginning in the left upper extremity and spreading bilaterally to the hands over

the past month and weakness in overall strength. <u>See</u> relevant Meritus Medical Center's

Records attached hereto as Exhibit 17 at p. 7. A CT scan of the head was completed

during this emergency room visit which was read as showing no hemorrhage, mass or

mass effect[23]. <u>Id</u>. at p. 12. The impression was no acute intracranial abnormality. <u>Id</u>. The

---

[22] Spinal traction is a form of decompression therapy that relieves pressure on the spine. It can be performed manually or mechanically. See http://www.healthline.com/health/spinal-traction#Overview1
[23] Mass effect is the result of increased intracranial pressure of any cause (e.g., brain tumor, blockage or accumulation of CSF in cranial cavity) which, in the non-distensible cranial cavity, acts like a mass. See http://medical-dictionary.thefreedictionary.com/mass+effect

{106506.DOCX}                                    16

diagnosis of the MMC emergency room physician was paresthesia and malingering. Id.

7.    **February 2012 Requests for Specialty Services and Utilization Review Decisions**

There is a written consult request in Plaintiff's medical chart dated February 14, 2012 which was authored by David Didden, M.D. See Exhibit 6 at pp. WEXMSJ000039-40.  The February 14th consult request identifies the specialty service requested as an MRI of the brain with and without contrast. Id. Dr. Didden notes twelve months of worsening pain, paresthesia and weakness with focal findings of unilateral upper and lower extremity weakness and dysmetria[24] on finger to nose testing plausible for demyelinating disease[25] indicating further diagnosis and testing necessary. Id.

In a note authored by P.A. Staub, Plaintiff's medical chart reflects on February 15, 2012, a collegial review discussion was held for a utilization review decision.  Id. at p. WEXMSJ000042. At that time, it was noted in Plaintiff's medical record that the utilization reviewer, Dr. Smith, deferred approval and requested the patient to be examined by Dr. Ali and if Dr. Ali agreed with the requested specialty care to re-present Plaintiff's case in collegial. Id. Consistent with the foregoing, Wexford's utilization review records reflect that a collegial review was completed with Dr. Smith and P.A. Staub as the participating providers. See Exhibit 7 at p. WEXMSJ000007. These records further note that the basis for the requested MRI of the brain was due to the Plaintiff's complaints of one sided pain and headache. Id.  It is noted that Dr. Smith requested additional information indicating "Dr. Ali to re-eval" and "represent in

[24] Dysmetria refers to a lack of coordination of movement typified by the undershoot or overshoot of intended position with the hand, arm, leg, or eye. It is a type of ataxia. See http://www.definitions.net/definition/dysmetria
[25] Demyelinating disease is a degenerative process that erodes away the myelin sheath that normally protects nerve fibers. It may cause problems in nerve impulse conduction that may affect many physical systems. It is seen in a number of diseases, particularly multiple sclerosis. See http://www.medicinenet.com/script/main/art.asp?articlekey=11143

1-2 weeks". Id. and see Exhibit 2 at pp. 111-112.

It is undisputed that this utilization review decision was not appealed by Corizon. See Exhibit 8 at p. WEXMSJ000003. It is undisputed that pursuant to the DPSCS Consult Policy and Wexford's UM policies and procedures that Corizon had the right to appeal the decision to defer the MRI of the brain until assessment by Dr. Ali to reverse the decision if medical providers disagreed with Dr. Smith's disposition of the request. See Exhibits 1, 3, and 4. Furthermore, exhaustion of all appeal remedies included: at the first level, reconsideration of this decision by Dr. Smith; at the second level reconsideration by a Corporate utilization review physician other than the originating reviewer; and at the third level, reconsideration by the DPSCS State Medical Director. See Exhibit 3 at p.WEXMSJ000020.  No such appeals were taken.

It is further undisputed that Corizon could have bypassed the prospective utilization management approval process for specialty care and send Plaintiff out immediately for emergent care if they were of the opinion that an acute process existed necessitating such emergent treatment. See Exhibit 1 at p. 12.

On or about February 22, 2012, Plaintiff's case was re-presented for utilization review of the request for MRI of the brain and approved by Dr. Smith. See Exhibit 6 a p. WEXMSJ000045.

Prior to the encounters with health care providers in February 2012, at no time was it relayed to Dr. Smith that a brain tumor was being considered as a diagnosis for which specialty care was needed. See Exhibit 10 at p. 155:13-17.

On or about, February 27, 2012, Plaintiff was transferred to Bon Secours Hospital for evaluation and acute care after a deterioration in his condition. See ECF

No. 30 at ¶39. An MRI of the brain was performed which revealed the presence of the foramen meningioma[26]. Id. Subsequently, on February 29, 2012, Plaintiff was transferred to UMMS for his continued acute care needs which included surgical removal of the tumor. Id. and see Exhibit 9 at p. 31. On March 7, 2012, the tumor was surgically excised. See Deposition transcript of Steven Poling attached hereto as Exhibit 18 at p. 75:8-9.

## III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that summary judgment will be granted when no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Haavistola v. Cmty. Fire Co. of Rising Sun, Inc., 6 F.3d 211, 214 (4th Cir. 1993); Etefia v. East Baltimore Comm. Corp., 2 F. Supp. 2d 751, 756 (D. Md. 1998). It is well settled that "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

While the evidence of the non-movant is to be believed and all justifiable inferences drawn in his or her favor, a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences. See Deans v. CSX Transp., Inc., 152 F.3d 326, 330-31 (4th Cir. 1998); Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985). Rather, a party opposing summary judgment must point to specific evidence giving rise to a triable issue, produce specific facts showing that there is a genuine issue

---

[26] See fn. 1.

for trial and may not rest upon the bald allegations of his pleadings. See Ross v. Communication Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985), *overruled on other grounds by* Price Waterhouse v. Hopkins, 490 U.S. 228 (1989).

Therefore, denials in the form of legal conclusions will not create a jury question sufficient to overcome a motion for summary judgment. Candlewood Obstetric-Gynecologic Assoc., P.C. v. Signet Bank/Maryland, 805 F. Supp. 328, 332 (D. Md. 1992). Furthermore, conclusory assertions that there are disputed facts do not transform undisputed facts into disputed facts. See Walpert v. Bart, 280 F. Supp. 1006, 1013 (D. Md. 1968) (the plaintiff has the duty under Rule 56(e) "to show the court that at trial he will be able to produce some fact to shake the credibility of the affiants. Mere hopes are not enough.") (citations omitted).

A court considering a motion for summary judgment and an opposition to such a motion must make a dual inquiry into both the materiality of the facts and whether there is a genuine dispute based on those material facts. Ross, 759 F.2d at 364. A fact is considered material for purposes of summary judgment only if, when applied to the substantive law, the fact affects the outcome of the suit. HRW Systems, Inc. v. Washington Gas Light Co., 823 F. Supp. 318, 325 (D. Md. 1993) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

## IV. ARGUMENT

### A. Plaintiff's Federal Constitutional Claims

Plaintiff is pursuing a civil rights claim for deliberate indifference to medical needs under 42 U.S.C. § 1983. To state a claim under § 1983, a plaintiff must allege "the violation of a right secured by the Constitution and laws of the United States, and must

show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48-49 (1988) (citations omitted).  Plaintiff contends the Defendants have violated his Fifth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution. See ECF No. 30 at ¶1.

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. Johnson v. Aldana, No. JFM-08-2111, 2009 U.S. Dist. LEXIS 74131, at *13 (D. Md. Aug. 19, 2009) (citing Gregg v. Georgia, 428 U.S. 153, 173 (1976)).  To state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of defendants (or their failure to act) amounted to deliberate indifference to a serious medical need. Id. (citing Estelle v. Gamble, 429 U.S. 97, 106 (1976)). Deliberate indifference to a serious medical need is defined as "treatment [that is] so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Hodgson v. Corizon Med. Staff, No. ELH-11-3515, 2012 U.S. Dist. LEXIS 103484, at *19 (D. Md. July 24, 2012); Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990), *overruled on other grounds by* Farmer v. Brennan, 511 U.S. 825 (1994).

The standard for reviewing medical claims under the Fourteenth Amendment is essentially the same as that under the Eighth Amendment. Hill v. Nicodemus, 979 F.2d 987, 991 (4th Cir. 1992). Similarly, for deliberate indifference to medical needs, the standard under the due process clause of the Fifth Amendment is at least equal to that of the Eighth Amendment for convicted prisoners. See Brown v. Lindsay, No. 08-CV-2182, 2010 U.S. Dist. LEXIS 26101, at *39 (E.D.N.Y. Mar. 16, 2010); Hart v. Foster, No. 1:08-3981-JFA-SVH, 2010 U.S. Dist. LEXIS 95279, at *17 (D.S.C. July 26, 2010).

The Ninth Amendment states: "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." U.S. Const. amend. IX. It has been argued that the Ninth Amendment protects rights not enunciated in the first eight amendments. See Griswold v. Connecticut, 381 U.S. 479, 486-99 (1965) (Goldberg, J., concurring); Wise v. Bravo, 666 F.2d 1328, 1332 (10th Cir. 1981). Nevertheless, the Ninth Amendment has never been recognized as independently securing any constitutional right for purposes of pursuing a civil rights claim. Canton Branch, NAACP v. Runnels, 617 F. Supp. 607, 609 n.3 (S.D. Miss. 1985); Bartel v. Federal Aviation Admin., 617 F. Supp. 190, 194 (D.D.C. 1985); Charles v. Brown, 495 F. Supp. 862, 864 (N.D. Ala. 1980). Furthermore, to the extent Plaintiff is seeking to recover under 42 U.S.C. § 1983, the Supreme Court has repeatedly voiced concern that a section 1983 claim be based on a specific constitutional guarantee. Daniels v. Williams, 474 U.S. 327, 337-38 (1986); Parratt v. Taylor, 451 U.S. 527, 544 (1981), overruled on other grounds by Daniels, 474 U.S. at 330; Paul v. Davis, 424 U.S. 693, 700-01 (1976). Therefore, the Ninth Amendment provides no right of recovery.

To recover under 42 U.S.C. § 1983 for constitutional violations to medical care, a showing of mere negligence is not enough to meet the standard. Hodgson, 2012 U.S. Dist. LEXIS 103484, at *19 (citing Short v. Smoot, 436 F.3d 422, 427 (4th Cir. 2006); Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999)); see also Farmer, 511 U.S. at 835. Indeed, "mere error of judgment or 'inadvertent failure to provide medical care, while perhaps sufficient to support an action for malpractice, will not constitute a constitutional deprivation redressable under [42 U.S.C. § 1983]." Boyce v. Alizaduh, 595 F.2d 948, 953 (4th Cir. 1979) (quoting Estelle, 429 U.S. at 104-05), abrogated on other grounds

*by* Neitzke v. Williams, 490 U.S. 319 (1989). In addition, inmates do not have a constitutional right to treatment of their choice. Dean v. Coughlin, 804 F.2d 207, 215 (2d Cir. 1986). Disagreements between medical staff and an inmate over the necessity for or extent of medical treatment do not rise to a constitutional injury and will not make out a cause of action under § 1983. Estelle, 429 U.S. at 105-106; United States v. Clawson, 650 F.3d 530, 538 (4th Cir. 2011); Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985); Taylor v. Barnett, 105 F. Supp. 2d 483, 487 (E.D. Va. 2000).

Furthermore, to state a cause of action under §1983, a plaintiff must allege and prove conduct indicating "deliberate indifference to a prisoner's serious illness or injury." Estelle, 429 U.S. at 105. In the context of an alleged denial of medical care, the health care provider's alleged conduct and treatment must be "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier, 896 F.2d at 851 (citation omitted).

Moreover, in order to state a cause of action under § 1983 in a medical context, the plaintiff must allege and establish specific facts showing an intentional denial of needed medical care or an intentional failure to provide diagnosis or treatment readily available. Estelle, 429 U.S. at 106. Accordingly, a plaintiff must supply "hard evidence" of an unnecessary and wanton infliction of pain which has resulted in serious medical or emotional deterioration. Lopez v. Robinson, 914 F.2d 486, 491 (4th Cir. 1990). The Supreme Court in Estelle distinguished between an inadvertent failure to provide medical care and a deliberate indifference to serious medical needs. Only the latter can form the basis for an action under § 1983. Daniels v. Gilbreath, 668 F.2d 477, 482 (10th Cir. 1982). A plaintiff's bare and/or conclusory allegations that the defendant acted

with deliberate indifference to Plaintiff's serious medical needs is insufficient to state a cause of action under § 1983.

Additionally, a plaintiff must adequately plead and prove that the health care provider acted with a sufficient culpable state of mind. Wilson v. Seiter, 501 U.S. 294, 297 (1991). Thus, the plaintiff must demonstrate that the health care provider exhibited a wanton and unyielding disregard to an objective intolerable risk of harm to Plaintiff. Farmer, 511 U.S. at 834. Said conduct on the part of the health care provider must rise to the level of subjective recklessness, in a criminal sense, to a substantial risk of danger of which they are specifically aware. Id. at 839-40.

This intent requirement is implicit in the Eighth Amendment's proscription of cruel and unusual punishment. Acts which are inadvertent, accidental or made in good faith do not constitute punishment and do not violate the Eighth Amendment. Brewer v. Blackwell, 836 F. Supp. 631, 641 (S.D. Iowa 1993). Accordingly, Plaintiff must allege and prove acts or omissions sufficiently harmful to evidence deliberate indifference. Estelle, 429 U.S. at 105-106.

### 1. Wexford Is Not A Person For Purposes Of 42 U.S.C. § 1983.

As a threshold matter, Wexford is a corporate entity and not a "person" for purposes of 42 U.S.C. § 1983. See 42 U.S.C. § 1983. Furthermore, principles of respondeat superior do not apply to § 1983 claims. See Hodgson, 2012 U.S. Dist. LEXIS 103484, at *21 (citations omitted); Brown v. Lindsay, No. 08-CV-2182, 2010 U.S. Dist. LEXIS 26101, at *39 (E.D.N.Y. Mar. 16, 2010); McNeill v. Wolfe, No. WDQ-10-3116, 2011 U.S. Dist. LEXIS 100782, at *7 n.3 (D. Md. Sept. 7, 2011) ("A private corporation is not liable under § 1983 for actions allegedly committed by its employees

when such liability is predicated solely upon a theory of *respondeat superior*." (citations

omitted)). Accordingly, Plaintiff cannot sustain a viable claim against Wexford for the

alleged wrongful acts of Dr. Smith. Accordingly, Plaintiff's claims against Wexford must

fail.

### 2. Plaintiff Cannot Establish The Existence Of A Policy, Custom Or Practice Of Wexford That Violated Plaintiff's Constitutional Rights.

A private corporation carrying out a governmental function, such as the delivery

of medical care in a prison setting, may be sued under § 1983 for constitutional

deprivations only if they result from policy, custom or practice of the entity. Monell v.

Dept. of Soc. Servs., 436 U.S. 658, 690 (1978). Accordingly, to establish a claim

against Wexford for the acts or omissions of Dr. Smith or its other employees involved

in Plaintiff's care during the relevant timeframe, Plaintiff must demonstrate that Wexford

maintained unconstitutional policies and procedures that were the motivating force

behind the alleged constitutional violations of its employees.

Stated otherwise, a claim for policy or custom liability requires a plaintiff allege

and prove: (1) the existence of an official unconstitutional policy or custom; (2) that is

fairly attributable to the defendant; and (3) that proximately caused the underlying

violation of the plaintiff's rights. See id.; Jordan by Jordan v. Jackson, 15 F.3d 333, 338

(4th Cir. 1994); Newbrough v. Piedmont Reg'l Jail Auth., 822 F. Supp. 2d 558, 582 (E.D.

Va. 2011) (emphasis added).

Therefore, it is not enough to identify a policy or custom of deliberate

indifference. Rather, a plaintiff must also allege and prove that the policy or custom is

attributable to the defendant and proximately caused the instant constitutional injury.

Monell, 436 U.S. at 692; Carter v. Morris, 164 F.3d 215, 218 (4th Cir. 1999) (requiring "a

close fit between the unconstitutional policy and the constitutional violation"). There must be a logical and natural connection between a policy or custom of deficient medical care and the instance of inadequate medical care. See Newbrough, 822 F. Supp. 2d at 583; see also City of Canton v. Harris, 489 U.S. 378, 391 (1989) ("[T]he identified deficiency . . . must be closely related to the ultimate injury."); Spell v. McDaniel, 824 F.2d 1380, 1389-91 (4th Cir. 1987); Milligan v. Newport News, 743 F.2d 227, 230 (4th Cir. 1984).

The requirement of a close fit between the unconstitutional policy and the constitutional violation carried out by the private corporate actor's employees serves several purposes. First, it helps to ensure that a municipality or the private corporate actor has made "a deliberate choice to follow a course of action . . . from among various alternatives." City of Canton, 489 U.S. at 389 (internal quotation marks omitted). Second, it assures that this choice was in fact the "moving force" behind the deprivation of federal rights. Monell, 436 U.S. at 694. A careful examination of this "affirmative link" is essential to avoid imposing liability on policy and custom decision makers in the absence of fault and causation. Carter, 164 F.3d at 218.

In Carter, the Court explained:

Section 1983 does not grant courts a roving commission to root out and correct whatever municipal transgressions they might discover -- our role is to decide concrete cases. Unfocused evidence of unrelated constitutional violations is simply not relevant to the question of whether a municipal decision maker caused the violation of the specific federal rights of the plaintiff before the court. Permitting plaintiffs to splatter-paint a picture of scattered violations also squanders scarce judicial and municipal time and resources.

Id.

In short, any liability on the part of Wexford related to any policies, procedures,

customs or practices is contingent on a finding that the custom and policy exists, that it was unconstitutional in practice and systemically implemented to deprive Plaintiff and others of care, that the policies and customs are attributable to Wexford and that they were the motivating force for their employees' acts or omissions which inflicted the constitutional injury on the Plaintiff. See City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986).

If a person has suffered no constitutional injury from the conduct of the alleged employee, the existence of a deliberately indifferent policy or custom is inconsequential. See Bowman v. Corr. Corp of Am., 350 F.3d 537, 545 (6th Cir. 2003) (private company which managed state prison could not be held liable under § 1983 for its medical-care policy, even if policy encouraged deliberate indifference to prisoner's serious medical condition, absent violation of prisoner's 8th Amendment right to adequate medical care by prison officials or prison physician); Young v. City of Mt. Rainier, 238 F.3d 567, 579 (4th Cir. 2001) ("The law is quite clear in this circuit that a section 1983 failure-to-train claim cannot be maintained against a governmental employer in a case where there is no underlying constitutional violation by the employee."); Trigalet v. City of Tulsa, 239 F.3d 113, 115-16 (10th Cir. 2001) (concluding that a municipality may be held liable only if the conduct of its employees directly caused a violation of plaintiffs constitutional rights).

Finally, it is not enough for the plaintiff to demonstrate that the individual employees were the final decision-makers on medical treatment for the specific inmates. Jimenez v. Hopkins County, No. 4:11-CV-00033-JHM, 2014 U.S. Dist. LEXIS 3722, at *45-48 (W.D. Ky. Jan. 13, 2014) (citing Johnson v. Hardin County, 908 F.2d

1280, 1285-87 (6th Cir. 1990)). Rather, the Plaintiff must prove that the individual employees were "vested with authority to make all . . . medical *policy* decisions." Id. (quoting Johnson, 908 F.2d at 1287) (emphasis in original).

   a.    **Wexford's UM Policy was Neither Unconstitutional Nor the Direct Cause of Plaintiff's Alleged Deprivation of Care.**

In his Amended Complaint, Plaintiff alleges that there existed a policy and practice of reducing inmate offsite health care costs which was both intolerable and shock[ing] [to] the conscience of civilized persons. See ECF 30 at ¶1. Plaintiff further alleges that Wexford failed and neglected to establish and implement policies, practices and procedures designed to assure that Plaintiff receive acceptable medical treatment and care or adopted policies, practices and procedures which it knew, or reasonably should have known, would be ineffective in delivering medical treatment and care at such standards, thereby endangering the Plaintiff's health. Id. at ¶¶ 51-52. The exhaustive discovery completed has failed to bear such allegations out.

First, Plaintiff has presented no evidence of a system-wide effort to deprive inmates of care based solely on cost-incentive factors and not the clinical needs of the patient. Secondly, Plaintiff has presented no evidence that Dr. Smith was vested with authority to make all medical policy decisions for inmates in the DPSCS system, including Plaintiff.

Furthermore, as to whether Wexford's UM Policy was unreasonable, Plaintiff's correctional health care expert, Robert Greifinger, M.D. testified in pertinent part:

   Q.    .......You agree that, based on the record as developed, that a request for specialty care had to be initiated by the on-site providers, correct?

   A.    Correct.

Q.   And that would be reasonable with respect to a UM process;
     is that fair?

A.   Yes.

Q.   Okay. And generally, you would agree that Wexford would
     have to be aware that a request was initiated, then, in order
     to process it and provide a UM decision; is that fair?

A.   Yes, that's correct.

                    ********************

Q.   .... you understand that as part of the process, there was an
     ability for whoever was presenting it, whether it be the medical
     director -- to provide clinical information to Dr. Smith regarding
     the patient and to have an exchange with Dr. Smith about the
     request.  Did you understand that to be part of the process, based
     on his testimony?

A.   Yes.

Q.   Okay. And would you agree that that would be a reasonable
     part of a UM process?

A.   Yes.

Q.   And you understood that the individual, whether it be
     the medical director or someone else who had been
     delegated to do it, could produce or could discuss with
     Dr. Smith pertinent information that was in the chart or
     that he had -- he or she had determined through evaluation
     of the patient and relay that information to Dr. Smith in
     real-time?

A.   Yes.

Q.   Okay. And would that be a reasonable part of the process?

A.   Yes.

Q.   And did you understand that..............based on Dr. Smith's
     testimony, that the individual would be relayed, directly, a
     determination regarding the request?

**********************

A.      I don't specifically recall his testimony, but I do not disagree
        with that.

BY MS. SMITH:

Q.      Okay. And so therefore, there would be real-time delivery,
        then, of what the determination was; is that fair?

A.      If that was the case, yes.

**********************

Q.      You understand that there was nothing in the policy, as it
        was written, that would bar a health care provider from –
        once they obtained new information, clinical information,
        additional information about the patient, from presenting
        a new consult request for a UM decision?

A.      Correct.

Q.      Okay. And that would be a reasonable part of the policy;
        is that fair?

A.      That's fair.

Q.      And you understand, from the testimony in this case –
        both from Dr. Smith and from the corporate designee for
        Corizon - that if there was an emergent need for the patient,
        that the UM process could be by passed altogether and the
        patient sent out.

A.      Yes.
Q.      And that would be an appropriate and reasonable part of
        the – the practice, the UM practice, correct?

A.      Yes.

See Exhibit 11 at pp. 77:7-18; 78:16-22; 79:1-20; 80:1-7; 82:9-22;83:1-6.

Plaintiff's expert Paul Genecin, M.D. also testified in pertinent part:

Q.      And, Doctor, based on the factual record that has been
        developed in this case, you understand that the primary
        care provider on-site was the individual that had to initiate

the request for specialty care; is that correct?

A.  Of course, yes.

Q.  And that would be reasonable, correct?

A.  Yes.

Q.  And you understand that the primary care physician is the one who is essentially evaluating the patient and gathering clinical information for the request itself; is that fair?

A.  Yes, the clinician is responsible for assembling the information.

Q.  And I think you testified that the primary medical provider must lay a foundation for the service, correct?

A.  Yes.

Q.  And so you agree that the UM reviewer has to rely on the information that is provided to that individual when making a decision?

A.  Yes.

Q.  And as you –

A.  In part, yes, in part.

Q.  All right. As you understand the factual record that has been developed in this case, Doctor, based on Dr. Smith's testimony did you gather that it was an encounter with the requester that was occurring in real time, that individual could relay information, and the UM reviewer, who was Dr. Smith could ask questions, correct?

A.  That is my understanding.

Q.  And did you find that part of the process reasonable, Doctor?

A.  Yes.

Q.  And you understand based on the factual record as developed that if there was a disagreement about the

decision that was being rendered that in real time the
individual could voice their concern or disagreement with
the UM reviewer, correct?

A.    That is what Dr. Smith testified.

Q.    And if that is accurate you would agree that that' would
be a reasonable process that was in place, a reasonable
component of the process?

A.    Yes, but understand that Dr. Oteyza gave different testimony
about that. And testified that he did not have access to what
actually went on in a collegial.  And was unable to make appeals
And had to take orders from the utilization management
physician.

Q.    I am not asking you about Dr. Oteyza. I am asking you as
you understood the process there was real time interaction
between the UM reviewer and the person presenting, correct?

A.    Yes.

Q.    And would you find that to be a reasonable process and that
there was an ability to exchange information and for the
individual requester to advocate for the patient and to raise
concern with the decision in real time?

A.    Yes.

Q.    From the factual record that developed in this case you
understand, Doctor, that there was an appeal process in
place, correct?

A.    Yes.

Q.    And that also would be a reasonable part of the process,
an ability to challenge the decision; is that fair?

A.    Yes.

See Exhibit 10, Vol. I at pp. 72:19-22; 73:1-22; 74:-22;75:1-21.

   "The deliberate indifference standard is a high one." Doe ex rel. Doe v. Dallas

Indep. Sch. Dist., 153 F.3d 211, 219 (5th Cir. 1998). Here, Plaintiff's own experts'

testimony make clear that there is nothing about the construct of Wexford's UM Policy that is patently unreasonable or shocking to the conscious to rise to the level of an unconstitutional policy deliberately indifferent to Plaintiff's medical needs. See Huffman v. Linthicum, No. H-06-0308, 2009 U.S. Dist. LEXIS 6652, at *46 (S.D. Tex. Jan. 29, 2009) (utilization review policy implemented was not so deficient that the policy itself acted as a deprivation of constitutional rights).

Nor is there anything about the Wexford UM policy which creates a reckless or unreasonable risk of deprivation of medical care for a serious condition. See Andrews v. Camden County, 95 F. Supp. 2d 217, 228-29 (D.N.J. 2000) (written policy must create an unreasonable risk of deprivation of medical care for serious conditions). To the contrary, Plaintiff's correctional health care expert, Dr. Greifinger has conceded that where Dr. Smith offered an alternative plan to request for specialty care that such decisions would not have been a bar to treatment for Plaintiff and that when Plaintiff was referred to specialist it would have been reasonable to rely on those specialists for developing a treatment plan. Dr. Greifinger testified in pertinent part:

> Q. Okay. And you agree that offering an alternative care plan is -- is often done by UM physician advisors with respect to -- with requests that are presented, if it is appropriate?
>
> A. Yes.
>
> Q. And you agree that that would not have been a bar to treatment for this particular patient, it would just be offering an alternative treatment plan to address his medical complaints?
>
> A. Yes.
>
> Q. All right. And you agree that there is no -- I think it -- there's no evidence in this case that the UM decision that was made at this time was ever appealed.

You would agree with that, correct?

A.     Yes.

*********************

Q.     Okay. And we -- we talked about -- earlier about alternative
       care plans and - and the UM process and alternative
       treatment plans that are often proposed By UM physician
       advisors. That is not a bar, per se, to care, correct? It would
       just be offering a different treatment plan to address the
       patient's needs?

       MR. WELLS: Objection.
A.     Yes.

Q.     ...... And, Dr. Greifinger, you agree that Dr. Smith,
       in fact, approved this request for a physiatry evaluation
       based on the information that was presented. There's
       no factual dispute there, correct?

A.     Correct.

Q.     All right. And do you have or have you reviewed the
       recommendations, at that time, made by the physiatrist
       after the patient was referred out?

A.     Yes, I have.

*********************

Q.     Okay. And do you agree that it was appropriate to send
       the patient to a physiatrist for the complaints that the –
       the patient was having or that were presented to Dr. Smith
       at that time regarding the patient?

A.      I.. I think it was acceptable.

*********************

Q.     Okay. My question was, you -- would you agree that it
       would be reasonable for the providers to rely on the
       specialist that they would refer a patient to and here in
       this case, it would have been Dr. Shelton - for developing
       a treatment plan for the patient.

A.    Yes.

See Exhibit 11 at pp. 93: 20-22; 94:1 -13; 95:20-22; 96:1-6 and 13-22; 97:1-6 and 18-22; and 98:1-2.

Moreover, the UM policy provided three levels of appeal to secure reversal of a decision which the on-site provider disagreed. See Exhibit 3 at p. WEXMSJ000020. To the extent Plaintiff was denied the specialty care, it was not due to the Wexford UM Policy per se as there was no effort made to reverse utilization review decisions and exhaust the appeal process which was in place. See Exhibit 10 Vol. I at p. 76:13-17; Exhibit 11 at pp. 80:12-16. Thus, any claim that Plaintiff was denied care due to the Policy is mere speculation.

Furthermore, it is undisputed that if a provider, in his or her clinical judgment, believed an inmate needed acute medical care that the utilization review process could be bypassed all together to directly refer the inmate for that acute care. See Exhibit 1 at p. 12. In fact, this option was exercised by the medical providers when Plaintiff was sent out for emergent medical care on January 15, 2012[27] and again on February 27, 2012 when he was diagnosed with the tumor at Bon Secours Hospital. See Exhibit 7 and Exhibit 17.

As set forth above, for a viable policy, custom and practice constitutional claim there must be a logical and natural connection between a policy or custom of deficient medical care and the instance of inadequate medical care. Newbrough, 822 F. Supp. 2d at 583; see also City of Canton v. Harris, 489 U.S. 378, 391 (1989) ("[T]he identified

---

[27] Unfortunately, the MMC physician failed to diagnosis the existence of the brain tumor and instead diagnosed Plaintiff with paresthesia and malingering after the CT scan of the brain did not identify the existence of the brain tumor. See Exhibit 17.

deficiency . . . must be closely related to the ultimate injury."). Here, Plaintiff's claim must fail as the undisputed facts do not support the existence of an unconstitutional policy attributable to Wexford or a logical link between the policy and practice and Plaintiff's alleged deprivation of care.

In short, in viewing the undisputed material facts in a light most favorable to Plaintiff, there is insufficient evidence for reasonable minds to find "a direct causal link" between the policy and the alleged denial of Plaintiff Poling's right to adequate medical care for the simple basis that it is undisputed that Corizon had the right to appeal Wexford's utilization decisions and failed to exercise that right. See, e.g., Blackmore v. Kalamazoo County, 390 F.3d 890, 900 (6th Cir. 2004) ("A municipality can be liable under 42 U.S.C. § 1983 only if the plaintiff can demonstrate that his civil rights have been violated as a direct result of that municipality's policy or custom."); see also Ford v. County of Grand Traverse, 535 F.3d 483, 497 (6th Cir. 2008).

Therefore, summary judgment in Wexford's favor is appropriate.

### b.    Plaintiff Has No Viable Failure To Train Claim Against Wexford.

The Supreme Court has underscored the narrowness of liability for failure to train. According to the Court,

> In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983. A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train.

Oklahoma City v. Tuttle, 471 U.S. 808, 822-823, (1985) (plurality opinion)), and see

Moody v. City of Newport News, 2014 U.S. Dist. LEXIS 181179, *48 (E.D. Va. Nov. 4, 2014). "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a

municipality -- a 'policy' ...can a [defendant] be liable for such a failure under § 1983".

City of Canton v. Harris, 489 U.S. 378, 389 (U.S. 1989)

Plaintiff contends that Wexford failed to train Corizon staff as to the existence of the appeal practice. As part and parcel of this argument, Plaintiff alleges that the Wexford UM policy was deficient in that it did not expressly include a specific role for the treating providers to participate in the UM appeal process and if there was such a role, the on-site providers were not adequately trained regarding how to access the appeal process. See Plaintiff's Supplemental Interrogatory Answers attached hereto as Exhibit 19 at p. 5.

However, there is no evidence that Wexford embarked on a deliberate or conscious choice not to train Corizon staff in regard to Wexford's UM Policy or the DPSCS Consult Policy. Furthermore, the factual record in this case has established that it was Corizon who was responsible for training its own staff and its locum tenens physicians as to Wexford's UM Policy and the DPSCS Consult Policy, including the ability to appeal utilization review decisions and that medical staff would have been oriented to the existence of these policies. See Exhibit 5 at 18:6-22; 25:14-25; 26:1-24; 27:3-14; 66:8-25; 67:1-22.

Plaintiff's own expert, Dr. Genecin, has also conceded that it would be reasonable to expect any on-site provider who was oriented to the policies to review them and to be aware that an appeal process existed. Dr. Genecin testified on the issue:

Q.   And my follow-up question was: So there was a process
     and that was an appropriate and reasonable process?

A.   On paper.

*********************

Q.      ..... Doctor, if there was a clinical service manual available for all of the
        clinicians at the facility that outlined the appeal process for consultations
        that was made available for treating clinicians that would be appropriate
        and reasonable, correct?

A.      It would be appropriate and reasonable provided that
        the clinicians were given information that it was there.
        And given that they were supervised and competent to
        provide appropriate capabilities and competencies of safe
        patient care so they could use the system appropriately.

See Exhibit 10, Vol. I, p. 78:1-5; 79:6-18.

Q.      And Doctor, if we go back to the fact that if they were handed material or
        given orientation information regarding the existence of an appeal process,
        would you expect a reasonably prudent clinician to know that there was an
        ability to advocate for the patient and get the care they were seeking?

        MS. CAMERON: Objection

A.      It seems reasonable that they would have done that. They did not.

Id. at p. 138:9-18.

Also fatal to Plaintiff's failure to train claim against Wexford is that Corizon makes

no contention that either it or the Medical Director[28] was unaware of Wexford's

utilization review decisions or Wexford's UM Policy and the DPSCS Consult Policy. See

Exhibit 8 at p. WEXMSJ00003-4; and Exhibit 5 at pp. 51:22-25; 52:1-7; 66-67; 75:6-22.

In fact, Corizon has conceded that: (1) it was aware of the utilization decisions; and (2)

that it was aware of the ability to appeal to reverse those decisions, but elected not to

do so. Id. Lastly, such a contention ignores the absolute right to bypass prospective

utilization review for acute care needs if the clinical providers identified such a need as

---

[28] Plaintiff alleges that Wexford did not comply with its own policy in that the Medical Director did not
participate in the collegial reviews. Exhibit 19 at p. 7. This is irrelevant as there is no contention the
Medical Director did not know the utilization review decisions made regarding Plaintiff's care or that his
lack of participation in collegial review prevented him or his designees from noting an appeal.

the presence of a brain tumor. <u>See</u> Exhibit 1 at p. 12.

**B.    Wexford's Utilization Review Decisions Were Not Deliberately Indifferent And A Medical Malpractice Claim Does Not Give Rise To A Violation Of Plaintiff's Constitutional Rights.**

Assuming *arguendo*, Plaintiff's claim is allowed to proceed against Wexford for the acts or omissions of Dr. Smith, which would be contrary to long established law on this point, as set forth above, a showing of mere negligence is not enough to meet the standard necessary for deliberate indifference to medical needs under § 1983. <u>Hodgson</u>, 2012 U.S. Dist. LEXIS 103484, at *19; see also <u>Farmer</u>, 511 U.S. at 835; <u>Grayson</u>, 195 F.3d at 695.    Rather, it is well settled that an action for medical malpractice will not constitute a constitutional deprivation redressable under [42 U.S.C. § 1983]." <u>Boyce</u>, 595 F.2d at 953 (quoting <u>Estelle</u>, 429 U.S. at 104). Accordingly, Plaintiff cannot convert a medical malpractice case to a claim for constitutional violations of rights solely on bald and conclusory allegations.

Plaintiff's claim for deliberate indifference turns on the failure to provide Plaintiff a prompt diagnosis for his brain tumor despite the reporting of symptoms associated with the condition to his on-site providers. Plaintiff baldy contends that the denials for specialty care by Dr. Smith were "deliberate and intentional" and issued without "proper foundation". <u>See</u> Exhibit 19 at pp. 3 and 5. In particular, Plaintiff alleges that the decisions made by Dr. Smith were not based on his review of Plaintiff's entire chart and his personal evaluation of Plaintiff. <u>Id</u>. at p. 5. This does not give rise to deliberate indifference.

Furthermore, it is demonstrably clear from the factual record that Dr. Smith's decisions were based on information relayed by the on-site providers regarding the

Plaintiff's clinical condition. Exhibit 2 at pp. 52-53, 64-65. Moreover, as a utilization review physician, Dr. Smith was not responsible for diagnosing patients. See Exhibit 11 at p. 122:12-16; Exhibit 13 at p. 38:6-16; Deposition Transcript of Mark Levin, M.D. attached hereto as Exhibit 20 at p. 53:7-11. Rather, Dr. Smith's role was to review the medical necessity, appropriateness and efficiency of the specialty care being sought. Exhibit 2 at p. 17.

Additionally, prior to February 2012, the on-site providers did not suspect[29] a brain tumor as the cause of Plaintiff's symptoms and thus, they never relayed to Dr. Smith that they were seeking specialty care for a suspected brain tumor. See Exhibit 10 Vol. II at p. 155:13-20. (Q: Did anybody express to Dr. Smith that they had a differential diagnosis of compressing brain tumor for this patient prior to February 2012? A: No, no one did.) Additionally, even when Plaintiff was sent to a hospital for emergent evaluation as late as January 2012, his diagnosis was unclear to the emergency department physicians who failed to identify Plaintiff's brain tumor. See Exhibit 17.

Accordingly, here, Wexford issued a series of utilization review decisions for a patient described as suffering from primarily cervical complaints prior to February 2012. See Exhibit 2 at pp. 96-100; 101:13-20; 103:16-19. Those utilization decisions provided for an alternative care plan, deferred approval for additional information or to allow a

---

[29] Plaintiff is critical of the on-site providers for failing to lay the appropriate foundation to Dr. Smith to secure the specialty services they sought. Specifically, Dr. Genecin contends that Dr. Oteyza created a situation in which there was not enough information to make a safe judgment about what kind of services the patient needed. Exhibit 10 at p. 64:2-22. Dr. Genecin further contends that Plaintiff's other providers did not take adequate history and exams, failed to develop a proper differential diagnosis for the patient and give adequate foundation for specialty care. Id. at pp. 174-193, 200:1-13. This concession flies directly in the face of any claim that Dr. Smith acted intentionally or recklessly to deprive Plaintiff of appropriate care by rendering utilization decisions he knew would cause harm to Plaintiff as Plaintiff acknowledges Dr. Smith did not have all of the information needed to assist him in reaching the right decisions.

recommended course of treatment first before pursuing further specialty care or approved care. Exhibit 6 and 7. Wexford continued to provide utilization reviews for non-emergent specialty care sought for Plaintiff after his diagnosis. See Exhibit 1 at p. 4. Wexford's complete utilization review decisions are summarized in the table below.

| Date of Consult | Specialty Care Requested | UM collegial review | Disposition | Appeal |
|---|---|---|---|---|
| 4/25/2011 | Orthopedic consult | 4/28/2011 | Conservative treatment approved as an alternative treatment plan | No appeal noted |
| 7/25/2011 | Orthopedic Consult for MRI of c-spine vs. consult | N/A. Never presented | No record of presentation for utilization review | N/A. Never presented |
| 8/22/2011 | Neurology | 8/24/2011 | Physical therapy as an alternative treatment plan approved | No Appeal Noted |
| 8/25/2011 | Physical therapy | 8/24/2011 | Approved | N/A |
| 11/1/2011 | Physiatry Evaluation | 11/2/2011 | Approved | N/A |
| 12/7/2011 | MRI of C-Spine | 12/14/2011 | Deferred to allow for completion of Physical Therapy with traction. Physical Therapy approved. | No appeal noted |
| 12/7/2011 | Cervical epidural | 12/14/2011 | Deferred to allow for completion of Physical Therapy with traction. Physical Therapy approved. | No appeal noted. |
| 2/14/2012 | MRI of the Brain | 2/15/2012 | Deferred approval to obtain additional information. Requested representation | No appeal noted |
| Re-presentation of the 2/14/2012 | MRI of the Brain | 2/22/2012 | Approved | N/A |

| Consult | | | | |
|---------|---|---|---|---|
| 3/14/2012 | Physical therapy following resection of meningioma | 3/20/2012 | Approved | N/A |
| 9/11//2012 | Neurosurgical follow up and MRI of the brain | 9/14/2012 | Approved | N/A |
| 12/20/2012 | Neurosurgical follow-up | 1/5/2013 | Approved | N/A |
| 12/20/2012 | MRI of the brain | 1/5/2013 | Approved | N/A |
| 7/1/2013 | Physical Therapy | 7/3/2013 | Approved | N/A |
| 4/23/2014 | MRI of the Brain | 5/28/2014 | Approved | N/A |

See Exhibit 6 at pp. WEXMSJ000003-4; 9-10, 14-22, 25-32; 40-42, 45, 48-59

Exhibit 7 at pp. WEXMSJ000001-21.

The undisputed material facts even when viewed in a light most favorable to Plaintiff, reflect utilization review decisions neither shocking to the conscious, nor reckless nor issued with a purposeful intent to cause harm to Plaintiff or deprive Plaintiff's access to care. Rather, during the collegial process[30] Dr. Smith listened to the request presented by providers during the relevant timeframe and in reliance on that information, in good faith, rendered decisions he deemed appropriate. Dr. Smith testified in pertinent part: "my job is to be a gate opener not a gate closer." See Exhibit 2 at p. 83:9-10.

At best, viewed in a light most favorable to Plaintiff, the undisputed material facts demonstrate no more than a claim for medical negligence for utilization review decisions

---

[30]Dr. Smith testified that "the collegial process is really to be exchange but not only an exchange, there is to be a didactic exchange" Exhibit 2 at p. 78:16-18. "At the end of the session we agree to the course of treatment no case was ever closed, if the patient changes in any way, form or fashion, the case would be brought back to collegial for review. So the door was always open. The door was always open for an appeal process. The door was open for continuation of bringing cases back to be heard as they evolved. Id at pp. 76:22; 77:1-10.

which Plaintiff contends fell below the standard of care – primarily on the grounds that Dr. Smith did not appreciate that Plaintiff's symptom complex supported more than a mere cervical neck problem, but a brain tumor - and which Plaintiff alleges delayed his diagnosis. While Plaintiff may disagree with the utilization review judgment decisions of Dr. Smith, Plaintiff through his experts have conceded that the alternative treatment plans issued did not bar Plaintiff's access to care. See Exhibit 11 at pp. 93: 20-22; 94:1-13; 95:20-22; 96:1-6 and 13-22; 97:1-6 and 18-22; 98:1-2.

Moreover, Plaintiff concedes: (1) the existence of an appeal process provided to medical staff to reverse decisions and secure the specialty care sought that was not per se unreasonable; and (2) the existence of immediate access to emergent care as an available option for Plaintiff's providers to obtain care without the need for pre-approval through utilization review.

Accordingly, judgment in Defendant Wexford's favor as to Count I is appropriate.

## C.  Plaintiff Is Not Entitled To Punitive Damages

As part of the relief requested, Plaintiff demands punitive damages. The Supreme Court has held that a jury may be permitted to assess punitive damages in an action pursuant to §1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when the conduct involves reckless or callous indifference to the federally protected rights of others. Smith v. Wade, 461 U.S. 30, 56 (1983).

Plaintiff makes no such allegations against Defendant Wexford in his Amended Complaint. Moreover, as demonstrated by the undisputed material facts, there is no evidence to substantiate a claim that Defendant acted with callous or reckless indifference to any federally protected right of Plaintiff. Rather, the record shows that no

acts or omissions of Wexford exist which would entitle Plaintiff to punitive damages.

As Plaintiff has failed to establish conduct which could possibly be characterized as deliberate indifference on the part of Defendant Wexford his request for punitive damages must be denied.

### D.     Plaintiff Cannot Prevail On His Claim For Declaratory Relief.

Plaintiff seeks a declaratory judgment reflecting that the acts and omissions of the Defendants violated rights secured to Plaintiff by the Firth, Eighth, Ninth and Fourteenth Amendments to the Unites States Constitution.

An unreasonable risk of serious damage to future health can support a claim for declaratory relief under section 1983 provided the underlying claim is established. See Helling v. McKinney, 509 U.S. 25, 39 (1993); Johnson v. Goord, No. 01 Civ. 95687 (PKC), 2004 U.S. Dist. LEXIS 19658, at *65, (S.D.N.Y. Sept. 29, 2004).

In the case at bar, Plaintiff does not allege nor do the facts support a risk of serious damage to future health or constitutional violations in connection with care provided by Wexford during the relevant timeframe. Accordingly, Wexford is entitled to judgment on Plaintiff's constitutional claims of deliberate indifference to his claim for declaratory relief grounded on alleged violations of 42 USC § 1983 violation must fail. Jimenez v. Hopkins County, No. 4:11-CV-00033-JHM, 2014 U.S. Dist. LEXIS 3722, at *45-48 (W.D. Ky. Jan. 13, 2014); See Sepulveda v. Lee, No. 10-1705-CAS (PJW), 2011 U.S. Dist. LEXIS 116548, at *22-23 (C.D. Cal. July 27, 2011).

### E.     Plaintiff Is Not Entitled To Injunctive Relief

Plaintiff seeks as permanent injunctive relief an Order from this Court: (a) enjoining the Defendants, their employees, agents, and successors in office from

providing medical care and treatment to Plaintiff and all other inmates of the Maryland

Correctional Institute that is inconsistent with the standards of medical care and

treatment in the State of as a whole; (b) enjoining the Defendants, their employees,

agents, and successors in office from refusing to provide and/or delaying provision of

necessary medical treatment and care to Plaintiff and all other inmates of the Maryland

Correctional Institute either at a suitable and adequate facilities within MCI-H or

elsewhere; (c) enjoining the Defendants and their successors in office from failing to

instruct, supervise and train their employees an agents in such a manner as to assure

the delivery of medical treatment and care to Plaintiff and all other inmates of the

Maryland Correctional Institute which is consistent with the standards of medical care in

the State of Maryland as a whole; and (d) requiring the Court to establish a panel of

independent medical experts to regularly evaluate the delivery of medical treatment and

care at MCI-H and insure the compliance of Defendants.

The plaintiff bears the burden of making a clear showing that there is a strong

likelihood of irreparable harm if the relief is not granted, that the harm is "neither remote

nor speculative, but actual and imminent." Direx Israel v. Breakthrough Medical Corp.,

952 F.2d 802 (4th Cir. 1991), *overruled in part on other grounds by* CW Capital Asset

Mgmt., LLC v. Burcam Capital II, LLC, No. 5:13-CV-279-F, 2013 U.S. Dist. LEXIS

91488 (E.D.N.C. June 28, 2013); see also Manning v. Johnson, No. CCB-12-2699,

2012 U.S. Dist. LEXIS 160588 (D. Md. Nov. 8, 2012).

After exhaustive discovery, Plaintiff has failed to established facts that would

entitle him to the injunctive relief he seeks. Rather, the factual record is void of: any

systemic-wide failure to deliver care to inmates in the DPSCS as a result of any policy,

custom or practice; an unconstitutional policy or practice that as implemented deprived Plaintiff of medically necessary treatment; a failure of Wexford to train its employees which resulted in a deprivation of medical treatment to Plaintiff; or deliberate indifference by Wexford to Plaintiff's medical needs. Accordingly, the undisputed facts do not warrant the granting of injunctive relief and such request be denied.

## V.     CONCLUSION

The undisputed material facts establish that Wexford is entitled to judgment in its favor as to Count I and that Plaintiff's request for punitive damages, declaratory and injunctive relief must be denied.