In the Matter Of:

*STEVEN POLING, No. 354-705*

*-v-*

*GARY D. MAYNARD, ET AL.*

---

*MARK BUCHANAN, M.D.*

*April 10, 2015*

---

Merrill Deposition Services - Washington, DC
1-800-292-4789                www.deposition.com/washington-dc.htm

**EXHIBIT 7**

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF MARYLAND

 3                          SOUTHERN DIVISION

 4
     _____
 5                                 )
                                   )
 6   STEVEN POLING, #354-705,      )
                                   )   CIVIL ACTION #: RWT-12-CV454
 7                Plaintiff        )
                                   )   HARTFORD, CONNECTICUT
 8        VS.                      )
                                   )   APRIL 10, 2015
 9   GARY D. MAYNARD, ET AL,       )
                                   )   11:00 A.M.
10                Defendant        )
                                   )
11   _____)   Pages: 1 - 96

12

13

14              DEPOSITION OF MARK BUCHANAN, M.D.

15

16         Deposition of MARK BUCHANAN, M.D., taken on behalf

17   of the plaintiff herein, for the purpose of discovery and for

18   use as evidence in this cause, pending in the United States

19   District Court, District of Maryland, pursuant to notice

20   before Vanessa Rose, Lic. No. 212, and Notary Public within

21   and for the State of Connecticut, at the office of REGUS,

22   100 Pearl Street, Hartford, Connecticut, on April 10, 2015,

23   at which time counsel appeared as hereinbefore set forth.

24

25   Reported by: Vanessa Rose     Job No. WDC-030409
```

Page 2

```
 1   APPEARANCES:
 2
 3
 4         FOR THE PLAINTIFF: (VIA VIDEOCONFERENCE)
             SHADOAN, MICHAEL & WELLS, LLP
 5           108 Park Avenue
             Rockville, Maryland 20850
 6         BY: GREGORY K. WELLS, ESQ.
             ANDREW HALL, ESQ.
 7           gwells@smwlawfirm.com
 8         FOR THE DEFENDANT WEXFORD: (VIA VIDEOCONFERENCE)
             MEYERS, RODBELL & ROSENBAUM, P.A.
 9           6801 Kenilworth Avenue, Suite 400
             Riverdale Park, Maryland, Connecticut 20737
10         BY: GINA M. SMITH, ATTORNEY-AT-LAW
             gsmith@mrrlaw.net
11
           FOR THE DEFENDANT CORIZON: (VIA VIDEOCONFERENCE)
12           MARKS, O'NEILL, O'BRIEN & COURTNEY, P.C.
             600 Baltimore Avenue, Suite 305
13           Towson, Maryland 21204
           BY: PATRICIA BEALL, ATTORNEY-AT-LAW
14           pbeall@moodklaw.com
15         FOR THE DEFENDANT OTEYZA: (VIA VIDEOCONFERENCE)
             GLEASON, FLYNN, EMIG & FOGELMAN, CHARTERED
16           11 North Washington Street, Suite 400
             Rockville, Maryland 20850-4278
17         BRAD ROEGGE, ESQ.
             broegge@gleason-law.com
18
19
20
21
22
23
24
25
```

Page 3

```
 1                        INDEX
 2         DEPONENT: MARK BUCHANAN, M.D.
 3
 4   Direct Examination by Mr. Wells.....................4
 5   Cross-Examination by Mr. Roegge....................92
 6
 7
 8
 9                       EXHIBITS
10   PLAINTIFF'S
11   1 for Identification   (Notice of Deposition)      9
12   2 for Identification   (List of Documents)        11
13   3 for Identification   (Grid Notes)               14
14   4 for Identification   (Report)                   15
15   5 for Identification   (Curriculm Vitae)          16
16
17     (ORIGINAL EXHIBITS ATTACHED TO DEPOSITION TRANSCRIPT)
18
19
20
21
22
23
24
25
```

Page 4

```
 1   THEREUPON,
 2         MARK CRAWFORD BUCHANAN, M.D.,
 3     704 Cherry Brook Road, Canton, Connecticut, 06019,
 4         first having been duly sworn, was examined
 5              and testified as follows:
 6   DIRECT EXAMINATION
 7   BY MR. WELLS:
 8      Q.  Dr. Buchanan, good morning again.
 9      A.  How do you do?
10      Q.  Fine.  We were introduced briefly off the record so
11   let's do this on the record.  My name is Greg Wells.  With me
12   is Andrew Hall and we represent the plaintiff Steven Poling
13   in the case he's brought against, among others, Wexford
14   Health Sources, Inc.  As you know we're here to take your
15   deposition today.  We want to try to get to this as
16   efficiently as we can.  I assume you've had your deposition
17   taken before?
18      A.  I have.
19      Q.  On approximately how many occasions, sir?
20      A.  Somewhere between five and ten.
21      Q.  Okay.  I'm going to ask you about, something about
22   those previous depositions in a moment, but let me just get a
23   couple things out.
24          First and foremost, as we go through this deposition
25   if I ask you any question that you do not understand, please
```

Page 5

```
 1   stop me and let me know that and I'll do what I can to fix
 2   whatever the problem is with my question, okay?
 3      A.  Yes.
 4      Q.  Secondly, this is not a memory contest, so at any
 5   time you need to look at any document in order to answer a
 6   question, feel free to do so.  We would just ask you identify
 7   for us on the record what it is that you are referring to
 8   when you answer the question, all right?
 9      A.  I understand.
10      Q.  Okay.  You told me that you had given five to ten
11   depositions before.  Were they depositions in cases involving
12   issues similar to those you've been asked to address in this
13   case?
14      A.  Yes.
15      Q.  Okay.  How many depositions have you given before
16   where you were asked to address issues similar to those
17   involved in this case?
18      A.  Most of those five to ten depositions would have
19   been in similar cases.
20      Q.  Have you ever given a deposition on behalf of or in
21   support of a defense of Wexford Health Sources, Inc. in the
22   past?
23      A.  No.
24      Q.  Have you ever given a deposition in defense of or
25   supporting the defense of Corizon Medical Services or
```

MARK BUCHANAN, M.D. - 04/10/2015                    Pages 50..53

Page 50
1   A.   I did notice it, yes.
2   Q.   And on some occasions you noted where Corizon has
3   indicated it made a request for certain type of specialty
4   care and you saw nothing in the Wexford screenshots that
5   reflected that, correct?
6   A.   Restate that, please.
7   Q.   Sure.  There are occasions which, in the Answers to
8   Interrogatories by Corizon, where we find requests for
9   services made for Mr. Poling that are not reflected in the
10  Wexford records, correct?
11  A.   This is in addition to that request made in July, or
12  allegedly made in July?
13  Q.   Yes.
14  A.   In addition to that, yes, there were some referrals
15  made in which the Corizon record, which included the written
16  referral form, asked for one particular service and the
17  screenshots coming out of the UR firm reflected a discussion
18  around the service that was eventually approved after the
19  collegial conversation.
20  Q.   All right.  We'll come back to that in the specific
21  request.  Where you saw a conflict between what Corizon
22  represented as a request that it made and what you noted as
23  requests from the Wexford records, did you take it as your
24  role to resovle the conflict between the two?
25           MS. SMITH:  Let me just object to form.  You

Page 51
1   can answer, Doctor.
2   A.   I did not see myself as an investigator here but
3   simply as one who is reviewing the records.  I do tend to
4   trust records that are created contemporaneously with a
5   conversation.  So I did not think that I could say exactly
6   what had or had not happened.  All I knew was what was
7   documented in those utilization review records.
8   Q.   And are you taking the position then that what you
9   have reviewed and assuming it as the documentation of the
10  conversations as complete documentation of the
11  conversations?
12  A.   I assumed that none of the documentation was a
13  complete description of the conversations.  I'm sure that
14  these conversations went on for some time and it's simply not
15  practical to record every word that was spoken.
16  Q.   So the first, going down what you've delineated here
17  as a request for outside services as described in the Wexford
18  records on page two, the first one you have is the April 28,
19  2011 which you listed as a request for outside orthopedic
20  evaluation, correct?
21  A.   Correct.
22  Q.   Did you actually review the consultation form or the
23  request that was actually written by the front-line
24  provider?
25  A.   Yes.  I believe I did.

Page 52
1   Sorry.  We're getting some extra sounds, but go
2   ahead.
3   Q.   Sorry.  Can we agree that at the time Dr. Smith, at
4   the time Dr. Smith acted on this request of April 28th, 2011
5   that the actual request was for exam, evaluate, and possible
6   biopsy of neck mass?
7   A.   That is correct.
8   Q.   And can we also agree that the screenshot from that
9   particular review that you're relying upon makes no mention
10  of a neck mass or evaluation, evaluate or possible biopsy of
11  a neck mass whatsoever?
12  A.   That is correct.
13  Q.   Did you have any concern about the accuracy then,
14  Doctor, of that screenshot in terms of what was requested for
15  this patient and why?
16  A.   Well, I note that it did not fully reflect
17  everything that was on the written note prepared by the
18  Corizon staff.
19  Q.   Whose responsibility was it to make sure that this
20  note accurately reflected what was presented by the Corizon
21  staff?
22  A.   Well, I think what's more important is to
23  document --
24  Q.   Doctor, answer my question, please.
25           MS. SMITH:  He is answering your question,

Page 53
1   Greg.  You can't just interrupt him.  Let him --
2           MR. WELLS:  He has not answered my question.
3   Madam Reporter, would you read my question back?
4           (Whereupon, the question was read back.)
5           MS. SMITH:  Let me just object to form.  You
6   can answer, Doctor.
7   A.   The information addressed at collegial is not fully
8   available to us, but I have confidence in looking at the
9   decision that the important parts of the presentation were
10  incorporated into the decision.  Can I explain why that is?
11          MR. WELLS:  Madam Reporter, would you read my
12          question back again, please?
13          (Read back.
14          MS. SMITH:  Same objection.  Asked and
15          answered.
16          THE WITNESS:  Let me take another run at this.
17          The information provided by the Corizon staff
18          certainly was on file at Wexford, but I do not
19          believe was essential to the proper completion of
20          the collegial.  Hence, I'm saying that Wexford did
21          not have a responsibility to slavishly copy
22          everything that was in the referral note.
23  BY MR. WELLS:
24  Q.   Did Wexford have an obligation to make sure the
25  referral note was accurate?

Page 66

1  time further trial of non-interventional, non-operative
2  treatment such as physical therapy was indicated, and if I'm
3  not mistaken that actually did cause some improvement.
4     Q.  What information are you assuming Dr. Smith had at
5  the time he denied this request in August 2011 for a
6  neurology consultation made by P.A. Staub?
7     A.  We see from the Wexford information that he had left
8  sided neck pain with radiculopathy going to the right upper
9  extremity.
10    Q.  All right.  And are you assuming for purposes of
11 this review that Dr. Smith consulted at the time that there
12 was a collegial discussion?
13    A.  Yes, I am.
14    Q.  And are you assuming that the collegial discussion
15 involved P.A. Staub?
16    A.  Yes.
17    Q.  Are you also assuming that P.A. Staub relayed to
18 Dr. Smith what she had written in her consultation request?
19    A.  I cannot judge that.
20    Q.  Why not?
21    A.  I wasn't there.
22    Q.  Did you read her deposition where she says she
23 typically reads what she wrote?
24    A.  Okay, fine.  That is her deposition.
25    Q.  All right.  Are you willing to assume that P.A.

Page 67

1  Staub read to Dr. Smith what she wrote in her consultation
2  report to support her request for this neurology
3  evaluation?
4     A.  If I may --
5         MS. SMITH:  Objection.
6         THE WITNESS:  If I may briefly consult the
7     deposition of Dr. Smith.  I've lost my roadmap.
8     Where is that list of everything I brought here?
9     Nevermind.  I found Smith here, if I could just
10    refer to that.  Can anybody point me to that to
11    speed me up?
12 BY MR. WELLS:
13    Q.  I was asking you about the physician's assistant
14 Emily Staub.
15    A.  No.  I will take your word for what she said at
16 deposition.  I'm just looking to see what Dr. Smith said
17 about this.
18        I do not see a statement specifically from Dr. Smith
19 about the content of that review.
20    Q.  So what does that mean to you, that you're not
21 willing to assume that P.A. Staub presented to him what she
22 had written as she says she typically does?
23        MS. SMITH:  I'm just going to object to the
24    characterization of P.A. Staub's testimony.
25    A.  I would say that I do not have outside data points

Page 68

1  by which I can judge the accuracy of her testimony.
2     Q.  Did you review the screenshots that you're relying
3  upon against this consultation note to see whether or not the
4  screenshot information accurately reflected the consultation
5  request written by P.A. Staub?
6     A.  I did compare the two and I noted that they, there
7  was some information written by P.A. Staub that did not find
8  its way into the screenshots.
9     Q.  And what information was that?
10    A.  Let me just check that.
11        What I see missing here is any doc -- from the
12 screenshot -- is documentation of what was found on
13 neurologic exam.
14    Q.  That's important stuff, isn't it?
15    A.  Neurologic examination is important, correct.
16    Q.  It's very important in this case because P.A. Staub
17 is concerned about a neurologic disorder, isn't she, or
18 potential for one?
19    A.  She does seem to be.
20    Q.  And that would be reasonable thinking based on what
21 she's written in her consultation report, correct?
22    A.  I'm sorry?
23        MS. SMITH:  Just object.  You can answer.
24 BY MR. WELLS:
25    Q.  And we can agree that that would be reasonable for

Page 69

1  her to think, based on what she's written in her consultation
2  report, that there is a potential for a neurologic disorder
3  in this patient?
4     A.  That was a reasonable thought, yes.
5     Q.  All right.  And in reviewing her consultation report
6  would you agree with me that this patient had a neurological
7  deficit?
8     A.  I cannot agree with you.
9     Q.  Why not?
10    A.  Because I believe this weakness that she mentioned
11 was at best equivocal, and I say that because some months
12 down the line when he was seen by a physiatry specialist who
13 has a great deal of training in neurology, that man was not
14 convinced that this was a significant loss or may have been
15 related to lack of full effort.
16    Q.  Can we agree that at the time that Dr. Smith acted
17 on this particular request he didn't have this subsequent
18 examination by the physiatrist?
19    A.  We can agree on that.
20    Q.  And if we assume that the clinical information that
21 he had at the time he acted on P.A. Staub's request for
22 neurology consultation on August 22, 2011 was that which was
23 contained in her note, can we agree that he had clinical
24 information that suggested this patient had neurological
25 deficit?

MARK BUCHANAN, M.D. - 04/10/2015                    Pages 70..73

Page 70
1  A.  If we assume that this information was presented
2  verbally at that meeting then he had information that there
3  might be a neurologic deficit.
4  Q.  All right.  And as an internal medicine practitioner
5  would Dr. Smith be obligated to approve a test that would
6  rule in or rule out a neurological disorder in this
7  patient?
8          MS. SMITH:  Let me just object.  You're asking
9       not in the UM position role?
10         MR. WELLS:  Same credentials as he has.
11         MS. SMITH:  Well, I'm asking.
12         MR. WELLS:  I'm asking my question.
13         MS. SMITH:  You can answer, Doctor.
14  A.  Could you restate it, please?
15         MR. WELLS:  Madam Reporter, would you read
16      that back, please?
17         (Whereupon, the question was read back.)
18         THE WITNESS:  The answer is no.
19  BY MR. WELLS:
20  Q.  Why not?
21  A.  I will tell you that every week in my practice I see
22  patients who may or may not have a neurologic disorder and I
23  do not do a definitive test.
24  Q.  Is that the entire basis for your answer?
25  A.  If you would like examples I'd be happy to give

Page 71
1  them.
2  Q.  I don't care about examples of what you just said,
3  but I want to make sure that's the entire basis of your
4  answer.
5  A.  The answer to the question that you just asked?
6  Q.  Yes, sir.
7  A.  Yes, that's it.
8  Q.  So, if we assume that Dr. Smith was provided with
9  the information in his consultation note prepared by P.A.
10 Staub, Dr. Smith would have learned that Mr. Poling had pain
11 in the left side of his neck that shot down his left arm,
12 correct?
13 A.  Correct.
14 Q.  He would have learned that Mr. Poling had daily
15 headaches as well, correct?
16 A.  Yes, he would have learned that.
17 Q.  He would have learned that the pain was constant?
18 A.  Correct.
19 Q.  He would have learned that the pain was sharp?
20 A.  Correct.
21 Q.  He would have learned that this patient was kicked
22 in the back of the head and neck three years ago?
23 A.  Correct.
24 Q.  He would have learned that the patient reported
25 numbness and tingling in his left arm?

Page 72
1  A.  Correct.
2  Q.  He would have learned that that numbness and
3  tingling in the left arm was constant?
4  A.  Correct.
5  Q.  He would have learned that he reported weakness in
6  his left arm?
7  A.  Correct.
8  Q.  He would have learned that he had decreased grip
9  strength?
10 A.  Correct.
11 Q.  He would have learned that the patient used one arm
12 to dress, shower, and feed himself because of the pain and
13 weakness in his arm, correct?
14 A.  Correct.
15 Q.  He also would have learned that the physician
16 assistant's exam documented decreased muscle strength on the
17 left upper extremity?
18 A.  That's correct.
19 Q.  He would have learned that the physician assistant's
20 exam also documented the patient was unable to fan his third,
21 fourth, and fifth fingers in the left hand, correct?
22 A.  That's correct.
23 Q.  He also would have learned that the patient had
24 decreased sensation on the left when compared to the right?
25 A.  That's correct.

Page 73
1  Q.  Would you agree with me that headaches with abnormal
2  neurological exam suggest a serious underlying disorder?
3         MS. SMITH:  Objection.
4  A.  Not necessarily.
5  Q.  Do you know how brain tumors present typically, what
6  the literature says about it?
7  A.  That depends on the brain tumor, but of course.
8  Q.  Would you agree with me that brain tumors usually
9  present in one of three ways: subacute progression of a focal
10 neurologic deficit, seizure, or non-focal neurologic disorder
11 such as headache?
12 A.  That covers the waterfront, yes.
13 Q.  Do you know whether or not trauma to the back of the
14 head or the neck is associated with meningioma?
15 A.  I have not heard of such an association.
16 Q.  You did see in Dr. Smith's deposition that to him a
17 patient with headaches, neck pain, and arm numbness would be
18 a patient for whom an MRI of the brain was in order?
19        MS. SMITH:  I'm going to object,
20     characterization of Dr. Smith's testimony.
21 A.  As I recall Dr. Smith was answering a highly
22 hypothetical situation in which he was not asked for any of
23 the details, for instance, of the headache.
24 Q.  Would you agree with me that a patient who presents
25 with headaches, neck pain, and left arm numbness is a patient

MARK BUCHANAN, M.D. - 04/10/2015                                Pages 22..25

Page 22

1  Q.  So the physicians and other healthcare providers
2  that you were responsible for supervising and training, et
3  cetera, were those healthcare providers actual hands-on
4  people in the jail and prison facilities?
5  A.  Yes.
6  Q.  What percentage of your time during the time you
7  were the Director of Medical Services for Correctional
8  Managed Health Care at the University of Connecticut did you
9  spend doing hands-on clinical care in any jail or prison
10 facility?
11 A.  No more than five percent.
12 Q.  And you were, you held this position as Director of
13 the Medical Services for Correctional Managed Health Care for
14 about ten years, 2002 to 2012, correct?
15 A.  That's correct.
16 Q.  And can you tell me the time that you spent doing
17 hands-on clinical care in the jail or prison facilities, was
18 that closer towards the beginning of your tenure, the middle,
19 towards the end or --
20 A.  I would say it was equally spread out.
21 Q.  So you would have provided hands-on clinical care to
22 some inmate in a prison or jail sometime in 2012?
23 A.  I'm trying to remember.  That was my last year on
24 the job.  Yes.
25 Q.  What jail or prisons did you --

Page 23

1  A.  Let me just check this.
2      Yes.  During the first month or so of 2012 I would
3  have seen inmates.
4  Q.  Where?
5  A.  The State has 19 facilities.  I couldn't tell you
6  which ones I went to.  I could tell you which ones I went to
7  most commonly, but I don't have a log of where I was.
8  Q.  Which ones did you go to most commonly?
9  A.  I mostly commonly went to Osborn, MacDougall-Walker,
10 York, Hartford, New Haven, and Bridgeport.
11 Q.  Do you feel any of those facilities that you went to
12 were similar to the facility that Mr. Poling was in that's
13 the subject of this case?
14 A.  I don't know --
15     MS. SMITH:  Just object.  Wait a minute,
16     Doctor.  Let me just object to form.  You can
17     answer.
18     THE WITNESS:  I don't know very much about
19     what this prison looks like.  I will tell you that
20     in Connecticut we have a combined prison-jail
21     system.  So some of our facilities are for
22     unsentenced inmates or people with short sentences.
23     Others are for sentenced people.  We have the full
24     gamut from medium security up to the highest level
25     of security.  We also have a wide variety of

Page 24

1  medical services.  Based on a person's medical or
2  mental health classification the person might be at
3  a facility with very few services or might be at
4  one that has a prison infirmary with the highest
5  level of services.
6  BY MR. WELLS:
7  Q.  During the times that you provided hands-on clinical
8  care in jail or prison facilities in Connecticut did you have
9  occasion to request specialty care for any inmate that you
10 may have seen?
11 A.  I did.
12 Q.  On how many occasions do you think you've done
13 that?
14 A.  I couldn't say.  I should say --
15 Q.  Was it more than five?
16 A.  Yes.
17 Q.  And you should say what?
18 A.  I should say that the universe of patients that I
19 saw was weighted richly towards those who might need
20 specialty services because in addition to going out sometimes
21 and taking on all comers just to provide coverage I would
22 sometimes go specifically to a prison with the intention of
23 seeing a particular inmate for whom specialty services had
24 been requested either by the inmate or by the onsite staff
25 and for whom there were outstanding questions in my mind as

Page 25

1  to what was appropriate.
2  Q.  So, let me just be clear.  So in this those
3  instances where you were going to see a particular inmate
4  were you the specialty consultant that was being requested?
5  A.  No.
6  Q.  Okay.  You were going to determine whether that
7  further specialty care should be obtained for the patient?
8  A.  That's correct.
9  Q.  Okay.  All right.  And on the occasions where you
10 went to see a particular patient to determine whether that
11 patient should receive some sort of specialty care, if you
12 thought the patient needed it what was the process that you
13 needed to go through to get that care for the patient?
14 A.  The process that I went through at that point would
15 be very much like the process that any of the doctors in the
16 facility would go through.  Depending on the year and whether
17 we had already gone electronic or were still on a paper
18 system, I would either complete a paper request and fax it
19 into the central office or I would sit down at a prison
20 computer and enter the facts of the case and the rationale
21 for the service into a system which would then be taken up to
22 central office.
23 Q.  And then what happens at that point?
24 A.  At that point a small team of nurses would add
25 information to the referral, things such as how long the